[Civ. No. 33594.  Second Dist., Div. Three.  Aug. 27, 1969.]

DELORES HARRIMAN et al., Plaintiffs and Appellants, v. CITY OF BEVERLY HILLS, Defendant and Respondent.

Miller, Vandegrift, Middleton & Sackin, Louis A. Sackin and Robert Hillison for Plaintiffs and Appellants.

Allen Grimes, City Attorney, and Colin Lennard, Assistant City Attorney, for Defendant and Respondent.

THE COURT.—

## Statement of the Case

Plaintiffs filed their complaint wherein they challenged the constitutionality of ordinance number 1228, chapter 20 of title 6, enacted by the City Council of the City of Beverly Hills, hereinafter referred to as the City. Application for a preliminary injunction restraining the enforcement of the ordinance pending trial was denied. Upon trial the court rendered judgment sustaining the constitutionality of the ordinance and denying plaintiffs' prayer for a permanent injunction enjoining the City from enforcing the provisions of the ordinance. The appeal is from the judgment.

## Statement of Facts

On November 4, 1964, pursuant to Resolution No. 3262, the City Council of the City established "A Citizen's Ad Hoc Committee to Study and Report on the Existing City Business Regulations." This committee, among other things, recommended to the city council the adoption of ordinance number.1228, here challenged.

The chairman of the "Ad Hoc Committee" testified in substance that the committee, in making its recommendation to the city council, considered, among other, things, that telephone answering services and their employees were in a position to obtain confidential information as to when subscribers would be away from their homes, that such telephone answering services and their employees were in a position to gain personal knowledge of the affairs and events in the lives of their subscribers from residential as well as business telephone lines. While he had no specific knowledge of burglaries or their circumstances, he thought "the uppermost consideration was the safety and protection of the community. How you define that, of course, is very broad. It is possible to say that, for example, apart from the possibility of burglaries, thefts, any of those things that have been previously mentioned, that, for example, operators could listen on the phone to conversations, and take confidential information for purposes of their own. I have no idea of what the vast potential of intent could be by people who so desire to misuse their function, but the question to us was who else is in this position of confidential information and knowledge. Well, lawyers, accountants, many people like this, are in this position. Bartenders, as I recall, in this state are fingerprinted. Accountants, I believe, are fingerprinted. Securities brokers and dealers are fingerprinted. The purpose here was to identify the employees and owners of this service, and that was the only purpose."

On April 1, 1965, the vice squads of the Los Angeles Sheriff's Department, in conjunction with the Los Angeles Police Department and the Beverly Hills Police Department, conducted a widespread raid on telephone answering services in the Hollywood-West Hollywood area. One of the telephone answering services raided was located in the City of Beverly Hills. This answering service was owned by Delores Harriman, doing business as Beverly Hills Call Board. Delores Harriman was arrested as the result of this raid. The purpose of the raid was to halt a purported conspiracy between prostitutes and telephone answering services. Upon trial in a criminal action following her arrest Delores Harriman was acquitted.

Following this raid the "Ad Hoc Committee" proposed that ordinance number 1228 be adopted by the City. After giving the telephone answering service owners an opportunity to present their viewpoint, the committee referred the matter

to the city council and the latter adopted the ordinance effective February 4, 1966.

The preamble to ordinance number 1228 reads as follows: "The Council of the City of Beverly Hills enacts the following legislation for the sole purpose of protecting the well-being of its citizenry from the hazards of a potentially harmful enterprise. Recognizing that there is nothing inherently objectionable in the operation of a telephone answering service, the Council nevertheless feels that the uses to which this device may be employed require the adoption of this chapter as a matter which affects the public interest and general welfare."

The ordinance requires the obtaining of a permit as a condition precedent to advertising the availability of or to operate a telephone answering service; requires the permittee to file with the police department the name, home address and business address of each employee; requires the permittee to notify the police department in writing of any change in personnel, and the new person is required to supply the police department, among other things, with a penal history, photographs, fingerprints, and such other identification and information as the chief of police may require. The ordinance provides that the chief of police shall conduct an investigation of the applicant and the applicant's employees with respect to determining their character, reputation and moral integrity based upon standards set forth in the ordinance and shall deny the application for the permit if the character, reputation or moral integrity of the applicant or the applicant's employees is found to be inimicable to the public health, safety, morals or general welfare. The ordinance also provides for an annual license fee of $50.

### Contentions on Appeal

Appellants urge that the ordinance is (1) arbitrary, (2) discriminatory, and (3) an unreasonable exercise of the police power.

Appellants argue that the ordinance is arbitrary on the basis that the City denominated telephone answering services as "potentially harmful" and not "inherently harmful," which, it is claimed, would encompass any type of business.

At the conclusion of the trial, the trial judge stated: "Without question the telephone answering service is a business that affects the public interest. It is one in which there are inherent dangers in that it could be used for illegal pur-

poses or to facilitate immoral activities. The ordinance in question is a reasonable attempt to provide some regulation over this type of business. It is not arbitrary or discriminatory in singling out this particular type of business, because there is a reasonable basis for distinguishing this type of a business from some of the others that are not regulated." We agree with this summarization and conclusion.

"Municipal competency to regulate business rests on municipal police power and municipal power to prevent, suppress and abate public nuisances, and its power to prevent businesses, industries, trades and occupations from injuring or menacing the public health, safety, morals, order, welfare and convenience, to prevent them from becoming public nuisances and to suppress them when they do. The power extends to all businesses and it extends to these evils whether they arise from the inherent nature of a business, the manner in which it is conducted or its location and surroundings. Otherwise stated, businesses, professions and occupations affected with a public interest are subject to reasonable regulation for the common good. The phrase 'affected with a public interest' is the equivalent of 'subject to the exercise of the police power,' and signifies no more than that 'an industry, for adequate reason, is subject to control for the public good.'" (7 McQuillin, Municipal Corporations, 1968 Rev. Vol., § 24.322, pp. 201-202.)

Businesses are divided, generally speaking, into two classes with respect to their regulation or prohibition under the police power. The first class embraces innocuous pursuits, and the second class comprises harmful activities. The first class includes both useful and useless pursuit that cannot reasonably be regarded as harmful or threatening to the health, safety, morality, order, welfare or convenience of the public. These pursuits are constitutionally protected as within the liberty of persons; they cannot be prohibited although they can be regulated. The second class comprises harmful businesses and those that reasonably can be considered by the lawmaking power to be intrinsically or potentially harmful to the public order and welfare. This class includes pursuits that are nuisances per se or frequently public nuisances in fact. These pursuits can be duly prohibited as well as regulated under the police power. "The first class of industries, businesses, trades and occupations described viz., those that are harmless, whether useful or useless, are subject to municipal regulation as distinguished from prohibition. ▉ Accordingly, a business, trade or occupation may be regulated by a

municipal corporation even though it is not a nuisance per se, illegal or frequently harmful to the public order or welfare. In other words, legitimate business can be regulated, and the fact that a business is inherently lawful will not exempt it from police regulation." (7 McQuillin, Municipal Corporations, 1968 Rev. Vol., § 24.325, p. 210; see *Wollam* v. *City of Palm Springs*, 59 Cal.2d 276, 284-285 [29 Cal.Rptr. 1, 379 P.2d 481]; *People* v. *Levy*, 8 Cal.App.2d Supp. 763, 768 [50 P.2d 509]; *Boyd* v. *City of Sierra Madre*, 41 Cal.App. 520, 523 [183 P. 230]; *Ex parte Quong Wo*, 161 Cal. 220, 228 [118 P. 714].)

The fact that the ordinance does not include and regulate such other businesses as milkmen, newspaper dealers, deliverymen, swimming pool services, gardeners and other services which might present possible variations on the potential evil which the ordinance is designed to protect against, as pointed out by appellants, does not militate against the constitutionality of such ordinance. The city council may confine its restrictions to those classes of cases where the need is deemed to be clearest.  ▮▮▮▮  "Municipal authorities and not the courts are to determine whether local conditions demand such legislation and they are vested with a large discretion not to be judicially controlled unless clearly violative of the organic law." (*In re Maki*, 56 Cal.App.2d 635, 642 [133 P.2d 64]; 3 Witkin, Summary of Cal. Law (7th ed. 1960) Constitutional Law, § 130, pp. 1935-1936.)

The ordinance in question does no more than recognize that the operation of an answering service is an inherently lawful activity. The enactment of the ordinance also recognizes the changing conditions of society and the necessity to control present day conditions calling for revised regulations to promote the health, safety, morals, and general welfare of the public. (See *Miller* v. *Board of Public Works*, 195 Cal. 477, 484 [234 P. 381, 38 A.L.R. 1479].) In considering the ordinance here under attack "it is to be presumed that the legislative body made inquiry in due course to determine whether there were evils to be remedied, and that the classification recognized in the ordinance was the result of such inquiry." (*Francis* v. *County of Stanislaus*, 249 Cal.App.2d 862, 872 [57 Cal.Rptr. 881].) When the right to enact an ordinance depends upon the existence of a fact the passage of the ordinance implies, and the conclusive presumption is, that the city council performed its duty, and ascertained the existence of the fact before enacting the law—a decision which the courts

have no right to question or review. (*Robins* v. *County of Los Angeles,* 248 Cal.App.2d 1, 6 [56 Cal.Rptr. 853].)

Appellants urge that the ordinance is discriminatory since telephone answering services situated physically outside the boundaries of the City service residences and businesses located within the boundaries of the City.

The city attorney of respondent City testified concerning the enforcement of the ordinance as follows: "A. I heard Mr. Piatt's [Finance Director and City Clerk of Beverly Hills] testimony today, like you did, and I have not prosecuted anybody or written to anybody outside for failure to comply. Q. And the only reason was you wanted to make a determination as to the validity of the ordinance in this litigation prior to taking any action? A. That is the principal reason, that and the work load, and I think it is more difficult to proceed with a prosecution or a collection action by civil suit in those cases than it is in this, so it seemed to us the primary concern was to first have the validity of the ordinance determined. Q. But you are confident that if the ordinance is sustained that you would be able to regulate those answering services outside the municipal boundaries of the city? A. I am unable to see any differences with respect to the type of service involved in the telephone answering service which would distinguish it from many other types of activities, which have been held by the courts to be subject to the city's regulatory ordinances. Q. Whether they are within or without? A. Whether they are within or without. Of course, as you know, we do not have much precedent to go on with respect to telephone answering activities."

Upholding a city ordinance establishing a district in which undertaking establishments were permitted and prohibiting them elsewhere, the court said: "The mere fact that outside of the permissive district there was other property similar in nature and character would not justify the court upon ascertaining that fact to substitute its judgment for the legislative judgment. The boundary line of a district must always be more or less arbitrary, for the property on one side of the line cannot, in the nature of things, be very different from that immediately on the other side of that line." (*Brown* v. *City of Los Angeles,* 183 Cal. 783, 789 [192 P. 716].)

In their claim that the ordinance is discriminatory, appellants are making the same argument, only in a different form, as they did regarding the exclusion of regulation by the City of other service businesses. Having in mind that article XI,

section 11 of the state Constitution delegates directly to inferior governmental agencies the police power in their respective localities and that the power so delegated is as broad as that of the Legislature itself, provided only that its exercise by any city must be confined to such city and must not conflict with the general laws of the state (*Pasadena School Dist.* v. *City of Pasadena,* 166 Cal. 7, 9 [134 P. 985, Ann.Cas. 1915B 1039, 47 L.R.A. N.S. 892] ; *People* v. *Taylor,* 33 Cal.App.2d Supp. 760, 761 [85 P.2d 978]), and the rule that the city council is not bound, in order to make its action valid, to extend its regulation to all cases which it might possibly reach, but may confine its restrictions to those classes of cases where the need is deemed to be clearest, and may make a reasonable classification, founded upon some natural, constitutional or intrinsic distinction (*People* v. *Western Fruit Growers, Inc.,* 22 Cal.2d 494, 506-507 [140 P.2d 13] ), we cannot say that the legislative determination to regulate only telephone answering services which are situated wholly within the city limits of the City, assuming that the city council may have some regulatory power over telephone answering services situated outside the boundaries of the city, but servicing residences and businesses situated within the boundaries of the city, is so palpably unreasonable and arbitrary as to place the ordinance within the constitutional prohibition against discriminatory legislation. (*People* v. *Western Fruit Growers, Inc., supra,* p. 506.)

Appellants urge that the ordinance in question is an unreasonable exercise of the police power in that, in comparison with the burdens imposed by the ordinance, the benefits to the public are negligible.

Courts have unhesitatingly overthrown attempted exercises of the police power when no just ground for its particular form of exercise is shown, and where the result is undue oppression of the plaintiff or a confiscation in one form or another of his property. (*Curtis* v. *City of Los Angeles,* 172 Cal. 230, 234 [156 P. 462].)

Stanley Owen Sachin, called as a witness on behalf of plaintiffs, testified that he is a partner in and general manager of the Pacific Answering Service located in the City of Beverly Hills; ordinance number 1228 had affected the business of his company in that their cost of training, obtaining and maintaining an adequate work force had been increased considerably over the period when they did not have the ordinance to comply with; applicants for positions with

his company were "very hostile about the concept of being fingerprinted"; the police department had "been most cooperative."

Clinton H. Anderson, Chief of Police of the City of Beverly Hills, testified that (as of the time of trial, December 8, 1967) no application for a permit to work as an operator in an answering service had been rejected although some of the operators had police records.

The trial court found, among other things, "That Ordinance No. 1228 does not impose an unreasonable burden upon the business of operating a telephone answering service in the City of Beverly Hills."

The requirement that the employee of an answering service allow the City to secure his photograph and fingerprints is not an unreasonable demand and may be analogized to similar situations where such information is likewise required by the state. Inasmuch as the police power of the municipality is coextensive with that of the state, except that it is limited to the jurisdiction within its boundaries and may not conflict with state or federal law, and may not encroach upon areas preempted by the state, reference may be made to state requirements of a similar nature. Section 2711 of title 10 of the Administrative Code requires that applicants for a real estate broker's or salesman's license must be fingerprinted; an applicant for a certificate as an agent or broker-dealer in securities, pursuant to section 25211 of the Corporations Code, is required to submit with such an application two sets of completed fingerprint cards (Admin. Code. tit. 10, § 260.211.1); any person seeking admission to practice law as a general applicant must furnish with his application one or more sets of fingerprints (rule VII, § 71, Rules Reg. Admission to Practice Law, adopted by Com. of Bar Examiners pursuant to ch. 4, div. III, § 6000 et seq., Bus. & Prof. Code); each applicant for a life diploma or teaching credential or for the renewal of such a credential is required to submit with his application duplicate personal identification cards upon which shall appear the legible fingerprints of the applicant (Ed. Code, § 13127); every applicant for a driver's license must allow his photograph to be taken (Veh. Code, § 12811); pursuant to the provisions of sections 18930 and 18931 of the Government Code, permanent employees of the State of California are required to be fingerprinted. (State Personnel Board, Personnel Transaction Manual, § 170.1 et seq.)

We are of the opinion that there is a just ground for the exercise by the City of its police power in regulating telephone answering services located within its boundaries, and we cannot say as a matter of law under the record here that such exercise results in undue oppression or a confiscation of property.

The judgment is affirmed.

Appellants' petition for a hearing by the Supreme Court was denied October 22, 1969.